# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 9, 2004 Session

## STATE OF TENNESSEE v. MARTY LAVERN PYBURN

**Direct Appeal from the Circuit Court for Marion County**
**No. 5601     Thomas W. Graham, Judge**

---

**No. M2003-01090-CCA-R3-CD - Filed August 16, 2004**

---

The appellant, Marty Lavern Pyburn, was convicted by a jury in the Marion County Circuit Court of first degree murder and sentenced to life imprisonment. On appeal, the appellant challenges (1) the sufficiency of the evidence; (2) the admission of his prior conviction of aggravated robbery for impeachment purposes; (3) the admission of photographs of the crime scene; (4) the expert testimony of Dr. Charles Harlan; and (5) the trial court's charge to the jury. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA McGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Philip A. Condra, Jasper, Tennessee, for the appellant, Marty Lavern Pyburn.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Sherry Gouger, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, Alice Rheal, the victim's grandmother, testified that when the victim was young, he lived in foster care. However, upon turning eighteen years old, the victim moved to Alabama to live with his mother. Around Thanksgiving of 2000, the victim returned to Tennessee to live with the appellant, his natural father. Mrs. Rheal related that shortly after 7:00 p.m. on January 7, 2001, the victim telephoned and asked her "to come and get him." According to Mrs. Rheal, the victim sounded upset and angry. Mrs. Rheal agreed to pick the victim up at his father's residence, but never again saw him alive.

Virginia Moore testified that the appellant and the victim lived with Moore's sister, Kathy Baggett, and Baggett's daughter, in a mobile home at the Jesse James Trailer Park. On January 7, 2001, Moore was at home with her husband when the appellant and the victim came to visit. The appellant, the victim, and Moore's husband went into another room to drink beer and play pool. Subsequently, the victim informed the appellant that he was ready to leave. The appellant told the victim to go outside and "warm up the car." When the victim went outside, the appellant sat down to watch television with Moore. Shortly thereafter, the victim came inside and asked, "Dad, are you ready to go?" The appellant replied that he was not yet ready and told the victim that he should wait in the car. The victim returned to the car. When the victim came back into Moore's residence, the appellant cursed, and he and the victim left.

Approximately fifteen minutes later, Moore telephoned the appellant at home. The appellant told Moore that he and the victim "w[ere] into it." The appellant informed Moore that he had told the victim to leave, but the victim refused. The appellant told Moore he was "fixing to kill the little MF." According to Moore, the appellant then laid the telephone down, and she hung up her telephone.

Shortly thereafter, the appellant telephoned Moore and told her that he had killed the victim. The appellant claimed to have shot the victim between the eyes. Moore testified that the appellant began to cry, and she told him to call 911. The appellant refused, saying, "No, he's dead." Moore again told the appellant to call 911, but the appellant refused, saying, "No, I'll go to jail." Finally, Moore told the appellant that she would call 911.

After hanging up her telephone, Moore immediately called 911. Five minutes later, the appellant telephoned Moore to ask if she had called 911. Moore replied that she had spoken to a 911 operator who was going to telephone the appellant. Moore testified that while she was on the telephone with the appellant, the appellant's telephone "beep[ed]," indicating another call. Moore told the appellant, "[P]lease answer the beep, it's 911." The appellant reluctantly agreed to speak to the 911 operator.

On cross-examination, Moore conceded that when interviewed by Allan Weeks, an investigator with the district attorney general's office, she did not mention that the appellant had ordered the victim to leave or that the appellant had said, "I'm fixing to kill the little MF." However, Moore claimed that directly after the incident, she was "in shock." Moore stated that she informed Weeks that the appellant had intended only to frighten the victim and that she had overheard the victim making comments in the background.

Carolyn Keahey, a 911 operator in Marion County, testified that on the afternoon of January 7, 2001, she received a call from a telephone number listed as belonging to Virginia Moore. Moore reported that the appellant had shot his son. Moore provided Keahey with the appellant's telephone number and address. Keahey contacted the Marion County Sheriff's Department and the paramedics and gave them the appellant's address. She then attempted to telephone the appellant several times, but received a busy signal. After telephoning Moore to ensure that she had the right telephone

number, Keahey again telephoned the appellant. Finally, the appellant answered. Keahey asked the appellant if there had been a shooting. The appellant said, "[Y]es. . . . Come get my son." The appellant informed Keahey that he had shot the victim in the head with a 30/30 rifle. Keahey testified that the appellant refused to check to determine if the victim was still breathing. Keahey remained on the telephone with the appellant until an officer with the sheriff's department and an ambulance arrived.

Sergeant Billy R. Powell of the Marion County Sheriff's Department testified that at approximately 7:12 p.m. on January 7, 2001, he responded to a call regarding a shooting at a mobile home at the Jesse James Trailer Park. He was the first officer to arrive at the scene. An ambulance arrived shortly thereafter. Sergeant Powell testified that as he walked onto the porch, he observed that the door to the mobile home was open. Sergeant Powell looked inside and observed the appellant "s[i]tting in a chair in the living room area holding on to a portable telephone." Because he was acquainted with the appellant, Sergeant Powell walked inside the residence and asked the appellant what happened. The appellant responded, "I shot him. We [had] been fighting." When Sergeant Powell asked the appellant whom he had shot, the appellant pointed toward a bedroom. In the bedroom, Sergeant Powell observed the victim's body on the floor with what appeared to be a gunshot wound to the head. He also observed a small knife in the victim's hand. When Sergeant Powell returned to the living room, the appellant asked, "Is he dead?" Sergeant Powell replied, "Yeah, he's dead." Sergeant Powell testified that without disturbing the scene, the paramedics confirmed that the victim was deceased.

Sergeant Powell told the appellant to remain seated and went outside to radio for assistance. He then returned to the mobile home and asked the appellant about the weapon used to shoot the victim. The appellant led Sergeant Powell to a small green gun cabinet which contained "a lever action 30-30 rifle." The appellant handed the rifle to Sergeant Powell. In the living room, Sergeant Powell observed a discharged shell casing on the floor. Sergeant Powell told the appellant to sit while he took the rifle to his patrol car. Shortly thereafter, Allan Weeks, an investigator with the district attorney general's office, arrived and Sergeant Powell "turned the [crime] scene over to him." On cross-examination, Sergeant Powell acknowledged that when he arrived at the crime scene, he observed items, such as photographs, cigarette butts, and potting soil, "strewn on the floor."

Officer Kevin Hubbard of the Marion County Sheriff's Department testified that on January 7, 2001, he responded to a call at the residence of Kathy Baggett at the Jesse James Trailer Park. Shortly after Officer Hubbard arrived at the scene, he was asked to transport the appellant to the Grandview Medical Center to obtain a sample of the appellant's blood for blood alcohol analysis. The blood sample was drawn in the presence of Officer Hubbard. After the blood sample was obtained, Officer Hubbard transported the appellant to the Marion County Sheriff's Department and gave the blood sample to Investigator Hargis, who sent the sample to the Tennessee Bureau of Investigation ("TBI") crime laboratory in Nashville for analysis. At trial, the parties stipulated that the results of the blood analysis revealed that at the time of the offense, the appellant had a blood alcohol content of .13 percent. The results also revealed the presence of the substance Butalbital in the appellant's blood.

Allan Weeks, the investigator with the district attorney general's office, assisted in the investigation of the shooting death of the victim. Weeks testified that when he arrived at the crime scene at approximately 7:30 p.m., he observed the appellant sitting in a chair in the living room. Weeks asked another officer to place the appellant in a patrol car. Upon being advised of the circumstances surrounding the offense, Weeks advised the officers that the crime scene needed to be secured. Thereafter, Weeks photographed and made a diagram of the interior of the mobile home.

Weeks testified that a live round of ammunition was discovered on the floor in the bedroom in which the gun cabinet was located. An empty hull was discovered on the floor in the living room. In the bedroom in which the victim's body was discovered, a portion of the window blinds was missing where a bullet had struck the blinds. A bullet fragment was discovered on the floor beneath the window. Additional fragments were discovered embedded in the wall behind the bed. The bullet fragments were taken into evidence.

Weeks further testified that the victim's body was lying on the floor between the foot of the bed and the bathroom. "[A] small straight blade . . . type knife" was discovered in the victim's left hand, and a sheath was discovered on the bed. "[R]ed stains [that Weeks] presume[d] to be blood" were discovered on a bathroom door near the victim's body. Weeks also observed a "red substance" on the window blinds. Weeks testified that he did not discover any "red type spatters" in the hallway. Weeks further testified that he observed "a substance" on the bed. On cross-examination, Weeks conceded that no samples of these substances were collected or submitted for analysis.

TBI Special Agent Dan Royce, a forensic scientist specialized in firearm identification, testified that in the instant case he received several items for firearm identification and comparison. Agent Royce received a rifle which he identified as a Winchester Model 94 30/30 lever action rifle. He explained that the rifle was operated by pulling a lever "down and forward," which action loaded a live round into the chamber and "cocked" the weapon. Agent Royce further explained that the rifle had several safety mechanisms. According to Agent Royce, in order to fire the weapon, the hammer had to be "cocked" manually, and the lever had to be pulled into position "against the stock."

Agent Royce testified that an expended Winchester 30/30 shell casing was submitted for identification. He compared the casing to test bullets fired from the rifle. Upon comparison, Agent Royce determined that the casing "had been fired in this rifle." Agent Royce also received two bullet fragments removed from a bedroom wall, one bullet fragment found at the base of the wall behind the bed, and several bullet fragments recovered from the victim's brain. However, only the fragment of "the copper bullet jacket" removed from the bedroom wall proved valuable for comparison. Upon comparison, Agent Royce determined that "the copper bullet jacket . . . had, indeed, been fired through the barrel of this rifle." Agent Royce explained that the bullet was a "170 grain power point [which] is a soft point cartridge . . . [with] exposed lead at the nose for the purpose of expanding when it strikes a target."

TBI Special Agent Oakley McKinney, a forensic scientist specialized in latent prints, testified that he was asked to process the knife discovered in the victim's hand for fingerprints. Agent

McKinney related that he did not find any latent prints on the knife. However, he testified that it was not uncommon to be unable to find a latent print that may have been present when the evidence was collected. He explained that latent prints were fragile. The print might have been "wiped off," or, because a latent print is ninety-eight to ninety-nine percent moisture, it might have evaporated.

Investigator Gene Hargis of the Marion County Sheriff's Department testified that on January 7, 2001, he was called to investigate the shooting death of the victim. When he arrived at the scene, he and Allan Weeks inspected the mobile home taking certain items into evidence, including a Winchester 30/30 rifle, a spent shell casing located on the floor in the living room, and an unspent shell casing located in the bedroom opposite where the victim's body was discovered. In the bedroom in which the victim's body was discovered, Investigator Hargis collected bullet fragments from the wall and the floor behind the bed. Investigator Hargis subsequently submitted this evidence, as well as bullet fragments recovered from the victim's brain, to the TBI crime laboratory for identification. Investigator Hargis also removed the knife from the victim's left hand and submitted it to the TBI crime laboratory for latent print examination. A nylon knife sheath was discovered on the bed in the bedroom where the victim's body was located. Investigator Hargis testified that he observed the victim's body lying between the bed and the bathroom and "red spatters" on the bathroom floor.

After processing the crime scene, Investigator Hargis returned to the sheriff's department to interview the appellant. After signing a waiver of his rights, the appellant submitted a written statement, which Investigator Hargis read into the record as follows:

> Me and [the victim] had been drinking pretty much all evening. [The victim] began telling me that I wasn't much of a father and began running his mouth to me. We had a fight in the living room where he hit me in the jaw. I told him to pack his clothes and leave. He went to his room for a while. [The victim] then grabbed a 30-30 rifle that was behind the living room door and went into his room and hollered, "I'm going to kill you." At that time I went into his room and took the rifle from him. I then went into the living room [and] put the gun behind the stereo speaker. I got up, went to the door . . . to let the dog in. As I was shutting the door I saw [the victim] coming out of his room with a knife held above his head coming towards me, saying he was going to kill me. I reached and grab[bed] the gun and it went off. We were face to face and he was coming towards me. [The victim was] about five or six feet from me when the gun went off. I went and called Virginia Moore and told her what happened. I then put the gun in . . . my room.

According to Investigator Hargis, the appellant claimed that when the rifle discharged, he was holding it "[a]s if . . . holding a long barrel weapon." When demonstrating the manner in which the victim was holding the knife, the appellant told Investigator Hargis that the victim was "holding up

[his] left hand with [his] fingers around the handle of the knife . . . and the blade pointing forward." Investigator Hargis testified that although the appellant claimed to have been struck in the jaw, he observed no injuries.

Dr. Charles Harlan, the forensic pathologist who performed the victim's autopsy, testified that the victim died as a result of a gunshot wound to the head. Dr. Harlan reported that "[t]he presence of stippling in this particular wound indicate[d] that the distance from the muzzle to the skin surface [was] somewhere from zero to 12 inches." He testified that the bullet entered the victim's head "in the front part of the right ear" and exited the back of the head. According to Dr. Harlan, as soon as the victim was shot, he would have been rendered unconscious and would have lost voluntary control. Dr. Harlan recovered fragments of a bullet from the victim's brain.

Blood analysis revealed that the victim had a blood alcohol level of .16 percent, and a drug screen of the victim's urine tested positive for tetrahydrocannabinol ("THC"), the active ingredient in marijuana. However, Dr. Harlan explained that urine could test positive for THC up to eight weeks after marijuana had been introduced into the body. When asked to view photographs of the crime scene, Dr. Harlan identified what appeared to be brain matter on the bed and blood spatter on the bathroom door and window blinds in the bedroom where the victim's body was located. However, Dr. Harlan testified that he was unable to determine from the photograph the species of the brain matter, and neither the brain matter nor the blood was submitted for testing. On cross-examination, Dr. Harlan acknowledged that black powder was not present around the wound because "the powder that was present in the material causing the stippling ha[d] been totally consumed."

Prior to closing its case-in-chief, the State recalled Alice Rheal, the victim's grandmother, to determine if the victim was right-handed or left-handed. Mrs. Rheal testified that the victim was right-handed. On cross-examination, Mrs. Rheal acknowledged that she had "quite a bit" of contact with the victim from the time he was nine to seventeen years old.

Kathy Baggett, the appellant's girlfriend of sixteen years, testified on behalf of the appellant at trial. She related that in January 2001, she and the appellant were living in a mobile home in the Jesse James Trailer Park with her daughter and the victim. The victim had moved in shortly before Thanksgiving the previous year. Baggett testified that on the day of the shooting, she left the mobile home at 5:00 a.m. to visit her son. According to Baggett, "[e]verything was normal when [she] left." However, when she returned, the living room was in total disarray. Baggett testified that she had purchased the 30/30 rifle from her brother-in-law approximately two months prior to the shooting. She kept the rifle loaded and locked in a gun cabinet. Baggett testified that she had previously allowed the victim to borrow the rifle for hunting.

Baggett testified that between Thanksgiving and Christmas of 2000, "[t]here was a lot of friction" in the home. She explained that the victim often asked the appellant for money, and the appellant would tell the victim to "get a job." Baggett explained that the topic of employment was "a source of some disagreement between the two of them." Baggett stated that they also argued over the victim's drinking. According to Baggett, the appellant told the victim to move out "more than

once," but the victim refused. However, the victim had lived with a neighbor for a short period of time.

Baggett testified that after Christmas, the relationship between the appellant and the victim worsened. Additionally, the appellant was "laid off." Baggett related that the appellant would often go to her sister's house because "the kids w[ere] starting to drive him crazy." Baggett testified that the appellant never discussed with her the details of the shooting.

On cross-examination, Baggett conceded that the appellant allowed the victim to consume alcohol on the day of the shooting. She further conceded that the victim lived with a neighbor after he and the appellant had a "heated argument," during which the appellant struck the victim and ordered him to leave. Baggett stated that she kept a key to the gun cabinet on top of the gun cabinet. The last time Baggett recalled seeing the rifle was when the victim borrowed it for hunting. She was uncertain how many shells were in the rifle because she did not know if the victim had reloaded the weapon. Baggett acknowledged that when she cleaned the bedroom after the shooting, she observed a red "gym type bag" at the foot of the bed. The bag appeared to contain the victim's clothes.

Eunice Kilgore testified at trial that she lived in the Jesse James Trailer Parker near the mobile home belonging to Baggett and the appellant. She related that the victim had stayed at her trailer on two or three occasions, once for approximately three weeks. Kilgore testified that on January 7, 2001, she received a telephone call from Virginia Moore. As a result of that telephone call, Kilgore watched for the appellant and the victim to return home. They arrived while she was talking to Moore. Kilgore testified that as the appellant and the victim walked to their mobile home, she heard what "could have been arguing." Approximately fifteen minutes later, she heard a "bump." Shortly thereafter, the police and an ambulance arrived at the mobile home. Kilgore claimed that she was not interviewed by the police. On cross-examination, Kilgore explained that Moore telephoned her twice that evening. Moore telephoned Kilgore the first time shortly before the appellant and the victim arrived home, then again approximately twenty minutes later prior to the arrival of the police and the ambulance.

Ira Rheal testified that he was married to Alice Rheal. Mr. Rheal testified that on the night of the shooting, the victim called before Mrs. Rheal returned home from work. The victim told Mr. Rheal that "he had to get away from there or he's going to have to kill [the appellant] or [the appellant] was going to have to kill him." The victim asked Mr. Rheal to pick him up at the appellant's mobile home, but Mr. Rheal did not go.

The appellant testified that in the fall of 2000, he lived in the mobile home at the Jesse James Trailer Park with Baggett and her daughter. Prior to Thanksgiving of that year, the appellant had little contact with the victim. However, shortly before Thanksgiving, he asked the victim to live with them. The appellant related that between Thanksgiving and Christmas, he and the victim had several "disagreements." The appellant claimed that although the victim was only eighteen years old when he came to live with them, the victim consumed alcohol regularly, often becoming "mouthy." The appellant asked the victim several times not to drink at home, but the victim refused to stop drinking.

The appellant also argued with the victim about the victim's choice of friends and his lack of employment; however, the appellant claimed that he had no influence on the victim. According to the appellant, the victim did nothing but stay out all night. The appellant testified that prior to Christmas, he told the victim to move out of the mobile home. The victim went to live with neighbor Eunice Kilgore, but returned a few days later.

The appellant testified that on January 7, 2001, the victim asked to go to Etna Mountain to shoot the rifle. The appellant told the victim that they would go when the football game ended. The appellant took the rifle from the gun cabinet and placed it behind the door to the mobile home. The victim and the appellant then went to Moore's house where they watched another football game and played pool. Both the victim and the appellant were drinking beer. When they finished playing pool, the appellant watched television with Moore. The victim informed the appellant that he was ready to leave, and the appellant told the victim to go outside and warm the car. The appellant testified that the victim came back into the residence once or twice and insisted on leaving. The appellant finally left.

The appellant testified that as they left Moore's residence, the victim told the appellant that he was angry with the appellant for not taking him to Etna Mountain. The appellant claimed that they continued to argue during the drive home and when they arrived home, the argument became more heated. The appellant stated, "[The victim] told me I wasn't never a father to him and I was never around and he hated me." According to the appellant, the victim wrestled the appellant to the floor and struck him in the head several times. When the appellant broke free of the victim's grasp, he told the victim "to go pack his stuff and call somebody to come get him. I'[d] had it with him." The appellant testified that the victim grabbed the rifle from behind the door and took it into his bedroom. The appellant went to the victim's bedroom, retrieved the rifle, and placed it back behind the door. The appellant then opened the door to allow the dog to come inside the mobile home.

The appellant testified that he was about to return the rifle to the gun cabinet when he observed the victim standing in his bedroom near the hallway with a knife in his hand. The victim threatened to kill the appellant. The appellant picked up the rifle and asked the victim to put down the knife. The appellant testified, "[The victim] lunged at me like he was going to run at me. That's when the gun went off." The victim fell. The appellant claimed that prior to the rifle discharging, he had neither cocked the rifle nor aimed it at the victim.

The appellant testified that he looked into the victim's bedroom, then went into the living room and telephoned Moore. The appellant claimed that he did not call 911 because he was "tore up." Instead, he told Moore that he had shot the victim and asked her to call 911. When he finished talking to Moore, he sat in a chair without hanging up the telephone and began to cry. He then heard the telephone "beep." It was the 911 operator. He told the operator what had happened and the police arrived shortly thereafter. The appellant testified that he returned the rifle to the gun cabinet sometime after the shooting. He related that after the shooting he did not know if the victim was dead, but he suspected it. The appellant related that Moore had telephoned while he and the victim were fighting, but he denied telling Moore that he was "fixing to kill the little MF."

-8-

On cross-examination, the appellant acknowledged that while at Moore's home, he had "a buzz" and the victim was intoxicated. The appellant conceded that when he placed the rifle behind the door, he did not check to see if it was cocked. He further conceded that he was not frightened when the victim threatened to kill him. He believed the victim was "just running his mouth." However, the appellant subsequently testified that he believed the victim was going to kill him, but maintained that the shooting was an accident. The appellant acknowledged that when he let the dog in, the victim was on the cordless telephone in the living room. He explained that there was only one telephone in the residence. When asked if he checked on the victim after the rifle discharged, the appellant replied, "I hollered, he didn't say nothing. I took it he was hurt." However, he claimed that he did not know the victim was dead until Sergeant Powell told him. The appellant denied telling Moore that he did not want to call 911 because he did not want to go to jail. He also denied placing the knife in the victim's hand.

Based upon the foregoing testimony, the jury convicted the appellant of first degree murder. The trial court imposed a life sentence with the possibility of parole. On appeal, the appellant challenges (1) the sufficiency of the evidence; (2) the admission of his prior conviction of aggravated robbery for impeachment purposes; (3) the admission of certain photographs of the crime scene; (4) the expert testimony of Dr. Charles Harlan; and (5) the trial court's charge to the jury.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant argues that the evidence was insufficient to support a verdict of first degree premeditated murder. In a separate issue, the appellant challenges the trial court's denial of his motions for judgment of acquittal. Upon denying the appellant's motion for judgment of acquittal at the close of the State's case-in-chief, the trial court found, "I believe there is sufficient evidence that a jury could use in this case. I'm not saying it's likely, but I'm saying there is sufficient evidence at this time to withstand the motion . . . , so I deny your motion . . . ." The appellant contends that the language, "I'm not saying it's likely," implied that the trial court found the State's evidence to be insufficient to support a conviction of first degree murder. However, the trial court explicitly stated that the evidence was sufficient for the jury to consider the charge of first degree murder.

In any event, this court has previously observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Moreover, "[a] motion for a judgment of acquittal made at the conclusion of the proof by the state is waived when the defendant elects to present evidence on his own behalf." State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998) (citing Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979)); see also Tenn. R. Crim. P. 29(a). Accordingly, we will address the appellant's complaint regarding the denial of his motions for judgment of acquittal as a challenge to the sufficiency of the evidence.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. Id. This court will not reweigh or reevaluate the evidence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined in pertinent part as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id. In Tennessee, once a homicide has been proven, it is presumed to be second degree murder, and the burden is on the State to prove the element of premeditation sufficient to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

Viewed in the light most favorable to the State, the evidence demonstrated that on the day of the murder, the appellant and the victim were arguing as they left Moore's residence. Moore subsequently telephoned the appellant at home, and the appellant informed her that he and the victim "w[ere] into it" and he was "fixing to kill the little MF." The appellant then laid down the telephone,

ending their conversation. Approximately fifteen minutes later, the appellant telephoned Moore and told her that he had killed the victim. The appellant told Moore that he had shot the victim between the eyes.

In his statement to police, the appellant claimed that when he observed the victim coming out of his room with a knife held above his head, he picked up the rifle from behind the living room door and it "went off." However, Baggett testified that she kept the rifle loaded and locked in the gun cabinet. She further related that she did not observe the weapon behind the living room door when she left the mobile home the morning of the murder. Moreover, Agent Royce testified that the 30/30 lever action rifle had various safety features and the rifle would not fire without the hammer being manually cocked and the lever being held against the stock. The evidence also demonstrated that the victim was shot in his room. Blood spatter and brain tissue were observed in the bedroom near the victim's body, and bullet fragments were recovered from the wall behind the bed. Contrary to the appellant's assertion that the victim was five to six feet away when the rifle discharged, Dr. Harlan testified that the muzzle of the rifle was no more than twelve inches from the victim's head. A knife was discovered in the victim's left hand, but Alice Rheal testified that the victim was right-handed. The jury could have reasonably inferred that the appellant retrieved the rifle, entered the victim's room, and shot the victim in the head at close range. The appellant's statement that he was "fixing to kill the little MF," the procurement of a deadly weapon, and the failure of the appellant to seek help for the victim support the finding of premeditation. We conclude that the evidence was sufficient to support the appellant's conviction of first degree premeditated murder.

## B. Prior Conviction

Next, the appellant contends that the trial court erred by allowing the State to introduce evidence of his prior conviction of aggravated robbery for impeachment purposes. The appellant concedes that simple robbery is a crime involving dishonesty, but argues that the offense of aggravated robbery "suggests injury and violence or threatened violence," thereby portraying the appellant as a violent person. The appellant asserts that the prejudicial effect of the aggravated robbery conviction outweighed its probative value on credibility. The appellant further asserts that the trial court made no finding as required by Rule 609 of the Tennessee Rules of Evidence that the probative value outweighed any unfair prejudicial effect. The State maintains that the trial court properly admitted the evidence of the appellant's prior conviction of aggravated robbery to impeach the appellant's testimony.

Rule 609(a) of the Tennessee Rules of Evidence provides, in pertinent part:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
>
> > (1) The witness must be asked about the conviction on cross-examination. . . .

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

"Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release." Tenn. R. Evid. 609(b).

In determining whether the probative value of a prior conviction on the issue of credibility is outweighed by its prejudicial effect on the substantive issues, "a trial court should (a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9, at 288 (2d ed. 1990)). A trial court's ruling under Rule 609 will not be reversed on appeal absent an abuse of discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Two months prior to trial, the State filed a Notice of Use of Prior Convictions for Impeachment Purposes, relying upon the appellant's 1981 convictions of passing a forged instrument, a 1983 conviction of burglary,[1] and a 1991 conviction of aggravated robbery. In a jury-out hearing at the close of the State's case-in-chief, the appellant challenged the use of these convictions for impeachment purposes, arguing that the 1981 and 1983 convictions were too remote to have any probative value and the prejudicial effect of the 1991 conviction of aggravated robbery outweighed its probative value on credibility. The State conceded that the 1981 and 1983

---

[1]The State subsequently conceded that the 1983 burglary conviction was a conviction for burglary of an automobile.

convictions were outside the ten-year period, but claimed that because robbery was a crime involving dishonesty, it was entitled to question the appellant regarding the 1991 aggravated robbery conviction. The trial court allowed the State to use the 1991 aggravated robbery conviction for impeachment purposes, finding the aggravated robbery conviction to be probative of the issue of credibility. The trial court further determined that the probative value was not outweighed by any prejudicial effect, finding aggravated robbery was not "similar" to first degree murder.

Tennessee courts have previously recognized that aggravated robbery is a crime of dishonesty. See State v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984) (armed robbery); State v. Goad, 692 S.W.2d 32, 37 (Tenn. Crim. App. 1985) (armed robbery); State v. James P. Stout, No. 02C01-9812-CR-00376, 2000 WL 202226, at *15 (Tenn. Crim. App. at Jackson, Feb. 17, 2000) (especially aggravated robbery). Moreover, contrary to the appellant's assertion, the trial court correctly determined that the prior conviction's probative value was not outweighed by any unfair prejudice, finding that "the thing that really hurts you as far as prejudicial is if the act is similar to the act that's being charged and crime being tried, that's not the situation here."

We conclude that the trial court did not abuse its discretion in ruling that the appellant's prior conviction of aggravated robbery was admissible as impeachment evidence. The appellant's credibility was a key issue at trial, and the appellant's prior conviction of aggravated robbery was probative of his credibility. Moreover, aggravated robbery and first degree murder are not similar offenses. See State v. DeShawn McClenton, W1999-00879-CCA-R3-CD, 2000 WL 987283, at *5 (Tenn. Crim. App. at Jackson, July 11, 2000) (concluding that prior convictions of attempted first degree murder were dissimilar to aggravated robbery and especially aggravated kidnapping); State v. Jeffery Jermaine Hankins, No. 02C01-9806-CC-00170, 1999 WL 569576, at *9 (Tenn. Crim. App. at Jackson, Aug. 4, 1999) (concluding that "the crime[] of aggravated robbery . . . [was] not so similar to the offense of murder second degree as to compel finding of prejudice"). The prior conviction of aggravated robbery was admitted only for impeachment purposes, and no details of the offense were introduced at trial.

## C.  Admission of Photographs

Next, the appellant argues that the trial court erred by admitting into evidence three photographs of the crime scene. The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). "'If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; . . . the photograph would be cumulative; . . . or [the photograph] is gruesome or for some other reason is likely to inflame the jury.'" Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973) (quoting 3 Wharton's Criminal Evidence § 637 (13th ed.)). However, relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

The appellant challenges exhibits 23, 25, and 26, which were crime scene photographs introduced over the objection of defense counsel during the testimony of the investigators who investigated and photographed the crime scene. Investigators Weeks and Hargis testified regarding the appearance of the crime scene when they arrived, including the location of the victim's body. The photographs were also used by Dr. Harlan to identify blood spatter and brain tissue in the bedroom where the victim's body was discovered. Exhibit 23 is a photograph of the bathroom door near which the victim's body was located. The photograph depicts what appears to be blood spatter on the door. Exhibit 25 is a photograph of the victim's body as it appeared when the officers arrived at the scene. Blood is visible on the carpet beneath the victim's body. Exhibit 26 is a photograph of a portion of the bed in the room where the victim's body was located. The photograph shows a substance that appears to be tissue on the bed. However, neither the blood nor the "tissue" was submitted for analysis.

We conclude that the trial court did not abuse its discretion by admitting the photographs. As the State correctly notes, the photographs were relevant to prove premeditation. By introducing the photographs, the State sought to establish its theory that "the [appellant] had entered [the victim's] room, after the argument had ended, and shot him with premeditation." The photographs also corroborated the testimony of Weeks and Investigator Hargis regarding the crime scene and provided the jury with a description of the scene. Although exhibit 25 is duplicative of another photograph of the victim's body which was introduced into evidence, exhibit 25 was taken at a slightly different angle and included the corner of the bed, thereby demonstrating the location of the victim's body in the room. This issue is without merit.

## D. Expert Testimony

The appellant argues that the trial court erred by allowing Dr. Harlan to testify as an expert for the purpose of identifying blood spatter and brain tissue in crime scene photographs. Specifically, the appellant challenges Dr. Harlan's qualifications to testify as an expert on these matters. The appellant further asserts that the testimony was "irrelevant, without proper foundation, and highly prejudicial." The State contends that Dr. Harlan was qualified to testify as an expert and the testimony was relevant.

At trial, the defense stipulated that Dr. Harlan was an expert in the field of forensic pathology.[2] However, after questioning Dr. Harlan about the cause of death, the State asked Dr. Harlan to view exhibit 26, the crime scene photograph of the bed in the room where the victim's body was discovered. Dr. Harlan identified what appeared to be "multiple portions of brain material" on the bed. Defense counsel objected, arguing that Dr. Harlan was not qualified to express such an opinion and the material had not been submitted for analysis. Following a jury-out hearing, the trial court determined that Dr. Harlan was qualified to testify for the purpose of identifying the material as brain tissue, but he was not allowed to testify that the brain tissue was that of a human.

---

[2]Dr. Harlan testified that he was the "senior active full time practicing forensic pathologist in the State of Tennessee," having performed more than 27,000 autopsies and testified at more than 5,000 trials.

Thereafter, the State asked Dr. Harlan to view exhibits 16 and 23, the crime scene photographs of the window blinds and the bathroom door in the room where the victim's body was discovered. Defense counsel objected, refusing to stipulate that Dr. Harlan was qualified to testify as an expert in the area of blood spatter. Nevertheless, the trial court determined that Dr. Harlan was qualified and allowed him to testify that the "red splatters" on the window blinds and bathroom door were "consistent with blood spatter and . . . the material was under pressure in striking the surface with a certain amount of velocity."

"If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. An expert may base her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing, and the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts in the particular field. Tenn. R. Evid. 703. The trial court shall disallow testimony in the form of an opinion if the underlying facts or data indicate a lack of trustworthiness. Id. Moreover, expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997) "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling regarding the admissibility of expert testimony absent an abuse of discretion. Id.

We conclude that Dr. Harlan was qualified to testify as an expert for the purpose of identifying the blood spatter and the brain tissue in the crime scene photographs. Our supreme court has previously observed that an expert witness "may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002), cert. denied, 124 S. Ct. 56 (2003). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id. During the jury-out hearing, Dr. Harlan testified that in addition to forensic pathology, he was "subspecialized" in neuropathology and had served as the head of the department of neuropathology at the University of Tennessee. Moreover, Dr. Harlan testified that he had received specialized training in the area of blood spatter, which training was "a portion of every forensic pathologist's background and training." He related, "I've worked with certain medical technologists who had special training in [blood spatter], including people who trained at Scotland Yard and I have a certain amount of expertise in that area beyond what the normal forensic pathologist would have."

We further conclude that Dr. Harlan's testimony was relevant and reliable. The crime scene photographs were introduced into evidence during the testimony of Allan Weeks, one of the investigators who photographed the crime scene. By questioning Dr. Harlan about the photographs, the State sought to introduce evidence that the victim had been shot in his bedroom. Dr. Harlan testified in great detail about the method by which he identified the substance on the bed as brain tissue, stating that he was able to identify the portion of cerebral cortex by the series of ridges and

valleys of which it was composed. When asked about the red substance on the bathroom door and the window blinds, Dr. Harlan's testimony was limited to the fact that the substance was consistent with blood spatter. Dr. Harlan acknowledged that he was unable to determine the species of the brain tissue and that neither the brain tissue nor the blood was submitted for analysis. We conclude that the trial court did not abuse its discretion when it allowed Dr. Harlan to testify as an expert for the purpose of identifying blood spatter and brain tissue in crime scene photographs.

### E. Jury Instructions

Finally, the appellant challenges the trial court's charge to the jury. A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and only invalidate the charge if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). When the charge correctly, fully, and fairly sets forth the applicable law, it is not error for the trial court to refuse to give a special instruction requested by a party. State v. Brown, 53 S.W.3d 264, 281 (Tenn. Crim. App. 2000).

The appellant first contends that the trial court failed to instruct the jury on the presumption of second degree murder. "[A]lleged omissions in the charge must be brought to the trial judge's attention at trial or be regarded as waived." State v. Haynes, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986). However, there is no requirement for an objection to the inclusion of an erroneous instruction or otherwise inaccurate charge. State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996). As the State correctly notes, the appellant did not object to the omission of the instruction at trial. Moreover, the appellant did not raise the issue in his motion for new trial, precluding consideration of the issue on appeal. Tenn. R. App. P. 3(e). Regardless, the issue is without merit.

In ruling on a similar request for a jury instruction on the presumption of second degree murder, this court has previously stated,

> [W]e acknowledge our supreme court's observation in State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992), that "[t]he law in Tennessee has long recognized that once [a] homicide has been established, it is presumed to be murder in the second degree." However, the import of this presumption is that "[t]he state bears the burden of proof on the issue of premeditation . . . sufficient to elevate the offense to first-degree murder." Id.; see also State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Schafer, 973 S.W.2d 269, 274 (Tenn. Crim. App. 1997). Therefore, when a trial court's charge omits the language of "presumption" but otherwise clearly informs the jury that the State carries the burden of proving each and every element of first degree premeditated murder beyond a reasonable

doubt and also includes a correct and complete instruction on second degree murder, a criminal defendant is not entitled to relief.

State v. Coulter, 67 S.W.3d 3, 68 (Tenn. Crim. App. 2001) (citations omitted); see also State v. Robert L. Leach, Jr., No. M2001-01421-CCA-R3-DD, 2003 WL 22002630, at * 17 (Tenn. Crim. App. at Nashville, Aug. 25, 2003).

In the instant case, the trial court did not charge the jury on the presumption of second degree murder. However, the trial court informed the jury that the State was required to prove each and every element of first degree murder beyond a reasonable doubt. The trial court also provided a complete and accurate instruction on the lesser-included offense of second degree murder. Accordingly, we conclude that the substance of the presumption of second degree murder was addressed in the trial court's charge to the jury. The appellant is not entitled to relief on this issue.

Next, the appellant contends that the trial court failed to instruct the jury that if the State failed to prove the elements of first degree murder or the lesser-included offenses of first degree murder beyond a reasonable doubt, the jury should return a verdict of not guilty. The State argues that the appellant has waived this issue for failure to cite authority in support of his contention. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). We agree with the State. Regardless, this issue is also without merit.

Considering the jury charge as a whole, we conclude that the instructions given by the trial court were a complete and correct charge of the applicable law regarding the State's burden. In its charge to the jury, the trial court instructed the jury on the elements of first degree murder and its lesser-included offenses, which included second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court also defined reasonable doubt and explained that "proof beyond a reasonable doubt [was] required as to every element or proposition of proof which constitutes a charge."

Contrary to the appellant's contention, the trial court instructed the jury as follows:

> Now, ladies and gentlemen, if you find the state has proven the defendant's guilt beyond a reasonable doubt on a charge in this case then you should find him guilty on that charge. On the other hand, if you find the state has not proven guilty beyond a reasonable doubt on a charge or count, then you must find the defendant not guilty on those charges.

The trial court further instructed the jury:

> [S]hould you have a reasonable doubt as to the Defendant's guilt of first degree murder, then you will consider the lesser included offenses of second degree murder, voluntary manslaughter, reckless

-17-

homicide, and criminally negligent homicide . . . -- if you have a reasonable doubt as to first degree murder then you're going to go down a ladder considering the next most serious offense. The next one is second degree murder. . . . [Y]ou first decide whether you think the state has met the burden beyond a reasonable doubt and if you find that it did then you'd put guilty there. If you did not find they proved it beyond a reasonable doubt, of course, you put not guilty.

We conclude that the trial court properly charged the jury regarding the State's burden of proof. This issue is without merit.

### III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE